Thank you. Okay, our third case this morning is number 15-17-69, Intellectual Ventures v. Symantec. Mr. Citron, is that how you pronounce it? It pleases the Court. What we take from the Supreme Court's decision in Alice, along with both the majority and dissenting opinions in DDR, is that when an inventor describes a specific way to overcome a recognized problem in existing computer technology, their invention is patent eligible under Section 101. And to be clear, when I say the patent overcomes a problem in the conventional design of computer technology, I mean it makes the technology better from the standpoint of its technological goals, not that it fills a hole in a tech company's business model. And I want to start by explaining precisely how the 050 patent does just that. So the 050 patent, if I understand it, is basically a way of dealing with spam. You identify an email by some characteristic, you compare it to a database, and you can find out that's spam, right? It's not by some characteristic. It's a pretty specific construct designed to overcome very specific technological problems. But I think the basic answer to your question is yes, it's mostly about identifying spam and also viruses, which are recited in the patent specification. Why isn't that like, I mean, some of these hypotheticals or examples may be a little bit far-fetched, but why isn't this like someone receiving mail, looking at it and seeing whether it's from some company that you don't want to have anything to do with and discarding it? And why isn't that sort of similar in the non-Internet world to what's going on here? And this is just taking that example and transferring it into this new context. Well, I think the answer is because that ignores all the very specific claim limitations that structure both the invention in light of the technological problems it was trying to solve. But that would be the step two of Alice, right? Well, I think it's not critical to us whether you conceive of that as step one or step two. I think DDR is a little unclear about whether it's a step one or step two problem. You can think of it as step two. I'm not saying just that the structures are specific. I'm saying that they're designed to solve a technological problem. In the example you just gave, the person has to read the email or look at it and determine whether it's from someone they don't want to receive mail from. The patent is trying to avoid just that problem. You don't want to open the email or download its content because it could be standard. No, but that's exactly the same thing that I was describing. You don't open the letter because it's not one that you want to read. You simply discard it. That has been going on for decades or longer. Right, but there are other technological problems described in the patent that it's trying to solve. For example, it talks about how, and this is at column one around line 57, about how senders of spam have become sophisticated in terms of masking who the sender is or using complicated subject lines in order to make it difficult to determine that it's spam. What they're doing is they're going to use a hashing algorithm to reduce that spam into a very unique form of file content identifier that can't just be an excision. It can't just be the sender. It can't just be the subject line. It has to be a very unique form of file content identifier. Then we're going to send that to the network to overcome a different technological problem, which is using up too much bandwidth by sending email back and forth to the server. Once we solve those two technological problems, what we've built is a better spam trap. I thought the district court found that that was routine. I think you could describe any individual step of the patent as routine or known completely on its own. The invention, as this court said in DDR and as the Supreme Court said in KSR, most if not all inventions come from combining otherwise known or routine steps into something unknown and not routine. I think there's no dispute that this was a breakthrough approach to the identification problem at the time. If you remember- Wait, wait, wait. How do we know that? There's no dispute there's a breakthrough approach? The jury has found that it was novel and non-obvious. In addition to that, I think if you think about- You say there's no dispute that it was a breakthrough approach. That dispute is not presented here. I'm sure the other side will dispute it, actually. Let me explain what I mean. At the time, and the patent describes this, virus detection was predominantly done, spam detection was predominantly done on the local computer. You would buy a piece of software off the shelf. It would have a database on it, and that database would have to be updated remotely. You would have to send all the new virus signatures to the local computer, and the local computer would try to screen spam. The patent specification itself describes the two technological problems that arose from that model. One was you didn't have up-to-date signatures, and the other was you were using up all the processing power of the local computer in order to do your virus and spam detection, and it teaches a different way of solving the problem. It involves using a mathematical algorithm to reduce the file into a unique file content identifier, sending only that teeny tiny file over to the server and using the server to do the processing. Those are solutions to technological problems. There isn't a business model issue. It's not teaching you how to make more money or sell more viruses, screening. It's telling you how to do better virus and spam detection. There's many of our 101 cases that in that sense involve technology. I mean the intellectual ventures, the earlier intellectual ventures case involved technology. I don't think that you get out from 101 just by saying there's technology involved. Let me make it clear in a much more specific way what I'm saying. The structures that are taught in the claim, the unique form of file content identifier that is not an excision from the middle of the file, and the two-tiered architecture of using one computer and then sending only the tiny very small bandwidth file to the server for processing, those are solutions to technological problems. In the IV case that you're describing before, they have the one. The question is whether they're routine or non-routine. I mean they're not routine in combination. There's never going to be a situation where you're going to be able to identify some totally unconventional step that is further novel from the invention itself. Like I said, the Supreme Court's been really clear about this. It says most, if not all, inventions are combinations of otherwise known or routine steps. So what I'm saying is the problem solved in IV. So each of the steps taken alone is routine but the combination is non-routine? I think that's right. I think that's what we have to prove at the obviousness stage. We have to show that you would not have combined these in this way. But I think there isn't a suggestion that the combination of these steps in order to solve the virus problem was routine. That's what invention looks like. You take steps and ideas from different fields and you use it in order to overcome a problem in another field. So just so I can get back to your question about Capital One. So the claims in that case were written to tailoring content on websites. And the problem there is not in the technology for tailoring. It's in the business model. The suggestion is, look, this content would be more attractive to people if it was tailored. And the court was very clear. It doesn't actually teach some particular way of doing the tailoring. It doesn't tell you that the tailoring has to be done this way or that way and overcome some problem in the existing software design. It just says, look, you're not tailoring content. The content would be better if it was tailored. That's not at all what the 050 is doing in the context of the patent at the time. And you can just read it off the face of the patent itself. In columns 1 and 2, there's a description of the problems being solved in the background of the invention. The description of those problems, they're all described as technological problems. They're about the efficiency and up-to-dateness and bandwidth usage associated with existing spam and virus traps. And this is saying, here, I've got instructions for building you a better virus trap. It's not designed to take a business or entrepreneurial idea from outside of the virus detection world and just say, apply it to your computer. Combining these features that you're describing was non-routine. I mean, the patent actually has a very detailed recitation of some of the benefits associated with the new distributed architecture that it's describing. So like in column 6, for example, it says, in one embodiment where spam determination is the goal, the algorithm computes, for example, the frequency with which a message, or in actuality, the ID for the message, is received within a particular time frame. If a particular ID indicating the same message is seen some number of times per hour, the system classifies the message as spam. All subsequent IDs matching the ID classified as spam will now cause the system to generate a reply that the email is spam. What it's describing is this new functionality unleashed by the two-tiered system. How do you read that into the patent? Where are those features in the patent claims? In terms of looking at the claims? The claims are themselves clearly a combination of these different elements. So in claim 9, for example, it starts with, receiving on a processing system file content identifiers for data files from a plurality of file content identifier generator agents. The patent teaches both what a file content identifier is. It's a very specific structure. It can't be just an excision from the file, like the subject name or the sender's address. It has to be hashed from the full content of the file, and it has to be particular, so that every single file of the same content will generate the same identifier. That's in the court's claim constructions. Then a file content identifier agent is also something taught in the patent. It's the piece of software that you're going to put on the local computer that's going to generate the file content identifier, and then it talks about receiving it on the processing system. The file content identifier is made through the hashing algorithm. That's right. And that was known conventionally, alone. Yes. We don't claim to have invented hashing. What is the, the jury found the patent was not invalid, right, after a trial? Valid, but not infringed, the 050. Not invalid. Not invalid. 102, 103, can you tell me a little bit about that? Just briefly. Oh, why they're not? What was the basis on which the jury was asked to, what were the defenses that were presented before the jury on invalidity? Was it 102? Was it 103? Do you know what the arguments were? I'm not fully prepared to brief those just because they're not briefed in the case. My understanding is that the – I just heard you talk about it earlier. Right, my understanding is that the validity defenses are associated with combining prior art references that would have taught, you know, independently the ideas of hashing, the ideas of the distributed system. But, you know, the jury found that they hadn't been combined in this particular way. But, you know, they will have a chance to try to convince this court that they're wrong, that we're wrong about that if they want to. But I think we should try to distinguish that question out of the present one to the extent possible. Do you want to save the rest of your rebuttal time? I would like to, yeah. Mr. Lynch. Mr. Tchaikovsky, starting. Good morning, Your Honors. Mr. Tchaikovsky, I represent Trend Micro. I'm primarily addressing the 050 patent for both Trend Micro and Symantec. We just heard a great deal about why the 050 should be patented. So Mr. Lumish is going to address the 610, all right? And the 142. And the 142, okay. And if I might, Your Honor, I may have comments on the 050 as well. That's fine. Go ahead. So we heard a great deal about why the 050 patent should be found patent eligible. But the focus, as Your Honors directly pointed to, was in a one-on-one analysis, we focused on the claims, not the specification, to see whether the claims have a valid idea inside of them. And as we've seen from cases from both the Supreme Court and the Federal Circuit, this court, that one, we look to see whether there's an abstract idea, and then two, if there is one, an inventive concept in doing so. We look to see, you know, does the claim have sufficient specificity? Is it specific enough? Does it detail the how that the claim is performed and the way to achieve a different result? Such as in DDR, where a claim was found to be patent eligible, where these claims do not have this. Instead, we see a rehash of the arguments that Intellectual Ventures made in its prior case in Capital One. These exact same arguments were made with respect to computer elements that were conventional and routine, somehow making the patents eligible, and they did not. The patents were found ineligible. So what they're saying here, as I understand it, is that while each individual element here at step two of Alice might be routine and conventional, the combination is not routine and conventional. What's your response to that? Well, the overall combination is routine and conventional, just like in Alice that the court found the combination to be routine and conventional. Moreover, this court, that is, excuse me, the district court, on pages JA-26 through 28 of its order, stepped through, and over three pages, the detail of how the order combination, after stepping through all of the independent elements of the claim, were generic or conventional. Had three pages focusing on the claim as a whole. And in focusing on the claim as a whole, found nothing significantly more than the generic computer implementation of the human executable abstract idea previously found, which was comparable to ones in cyber source and content extraction. And that's on JA-26. The claims don't say the how, that is, Internet Patents Corp. or Dealer Track or IV Capital One, that is required. And that's exactly why the order combination does not get you there, is because the how, the detail of how to get to the result, is not there. In fact, one of the best quotes from the court in using the abstract idea and then combining it to show you that the order combination is nothing more than the sum of its parts, is receiving and sending information, including a file content identifier, or a response. So we've got receiving it, the content identifier, and a response describing content or identifying a characteristic over a network is not arguably an inventive concept. That's on JA-26, citing Alice. Court took that on. And court looked at the order combination. And court looking at the order combination even then compared this to similar processes held routine and conventional in other areas. And again, as I said, mostly from CyberSource and mostly from BiSafe. But the court did it at length. And this isn't a question of novelty or non-obviousness. I mean, in Ultramercial, the claims were found to be not patent eligible. But the claim was not in the prior art. No one could establish that Ultramercial claims, its 11 steps, was in the prior art, but yet it was patent ineligible. Similarly here, Your Honor asked a question about invalidity. Will all claims stand rejected at the patent office waiting on appeal based on more than six references that all disclose hashing and spam that occurred prior to the point of this? So if we were focusing on invalidity based on prior art, we have a multitude of references that the patent office What is that proceeding that's going on at the PTA? That's Interparties Reexamination. It was actually filed right before. It's Interparties Reexamination. It's been finally rejected at the patent office. And the claims, all asserted claims, are up on appeal. So it's pending before the board? PTAP, yeah, that's correct, for review. And that's where that currently sits. That's correct. Did the jury consider any validity? The jury did consider, Your Honor, as to your questions. But there were limited references. Given the time and given the three patents in suit, there were limited references put before the jury and not the numerosity of references and information put before the patent office. And so there is a distinct difference. In addition, I will tell you, the patent office actually didn't use the broadest reasonable interpretation. The patent office, as it's in the record, used the district courts in addition to the BRI, used the district courts' claim construction in invalidating the claims. So we have this unique case procedural posture where, DDR being one of the only other ones, where we have a case that went over four and a half years. This district court looked at the claim construction, came up with the claim construction, heard the experts testify, had two weeks of trial with experts testifying. We had asked, I know sometimes it's thought to have early Alice motions, but Alice came out in June 2014. Trend Micro asked the court in approximately November of 2014 for an early Alice motion. Symantec's trial came in January of 2015. The court said, I'll hear it after trial. And that's exactly what happened. Our briefing went in right after trial. We had a hearing in April of 2015, and the court found the patents to be ineligible with that procedural posture. I see I'm eating into my six minutes now. If you have any more questions about 050, I'd be happy to answer. I'm a little confused about the procedural posture of this. There was a trial involving Symantec, right, which resulted now in the entry of a final judgment with respect to the 610 patent, correct? With respect to all three patents at issue here, the 050, the 142, and the 610 patents, yes. But the 050 and the 142 had been found to be patent ineligible, so that didn't go before the jury, right? They were found ineligible after the trial for Symantec. So the court addressed it, and we asked for it to be addressed prior to the trial. The district court decided to address the issue after the trial, but just prior to Trend Micro's trial proceeding. Okay. All right. Thank you, Your Honor. Mr. Lumish? Thank you, Your Honor. May it please the court, Doug Lumish for Symantec. Has there been an appeal from the final judgment that was entered in your case? Not yet, Your Honor. The final decision, the final judgment was only just entered in the last, I'd say, 30 days or so. Are you appealing? We will be. It depends on the outcome of this at some level, whether it reaches your honors on the 050. Well, there's a potential jurisdictional problem with respect to the 610 patent as to whether the court had the authority to enter a Rule 54B judgment with respect to that, which would be cured if the entire case went to final judgment and the final judgment were before us. Well, we do believe it's been cured and that there is now a final judgment, Your Honor. To the extent there ever was a defect, I'm not sure there was. There is now a final judgment. It will be appealed. They are not, obviously, before you together in a single appeal today. But the district court has entered that final judgment. I think so. You will have jurisdiction over it. Okay. Go ahead. The appeal, as we see it, Your Honors, centers on two fundamental issues of 101 law, and this is true for all three patents in suit, 050, 142, and the 610. The first critical and, I think, fundamental tenet is that eligibility for patents under Section 101 should not devolve or hinge on what the Supreme Court has called the draftsman's art, the recitation of computer-specific limitations in claims that otherwise claim abstract ideas. Let me tell you what I see as the problem with respect to the 610 patent. I see some of these analogies about how this was a well-understood concept to be a bit far-fetched. On the other hand, what you have here is a well-known application of virus software at the user's computer, and the patent here seems to be solely directed to the idea of moving that virus activity to the telephone network from the user's computer. The question is whether that's an abstract idea. I, for the moment, don't see that as being a preexisting concept, that is, the movement from the user's computer to the telephone network. On the other hand, it does seem to be a very abstract and broad concept, and maybe under cases like O'Reilly and our own BRCA case, even a new idea can be an abstract idea. But I say that to help counsel understand at least what my concerns are, not speaking necessarily for my colleagues. Could you address that? Let's assume that the 610 patent that we conclude doesn't involve a preexisting concept the way Alice did, the way Mayo did. Can it still be abstract? Taking that assumption, Your Honor, I'll start with O'Reilly. Even Professor Morse, as illustrious as he is and as celebrated as he's been for what he's contributed to American technology, was not permitted to claim the concept divorced from or separated from the implementation. The specification that told you how the telegraphy machine worked, told you how Morse code worked, and he was entitled to claims that covered those things. When he gets to Claim 8 and he says, I want all ways of communicating with galvanic forces, or what he called the motive force of electromagnetism, the Supreme Court said he couldn't do it because he was claiming an outcome separate from the specific machine and the specific process. But how do we draw the line? I mean, where you're dealing with a preexisting concept which is being taken from the paper world, the internet, or whatever, I mean, I think our cases indicate that we've dealt with that, we understand that pretty well. But assuming that that isn't this situation, how do we define what's an abstract concept? I mean, to say, well, the claim is too broad isn't all that helpful. So drawing on the Supreme Court and drawing on your honors, this court's precedent, and I think there are two things you should do to draw the line. One is you should look and see under the words of Atlas whether the claim purports to improve the function of the computer itself. Is it actually saying this is a better machine or a better process, a better program than existed before, or is it just saying use known computer technology? Does it improve the network, or does it improve the computer with respect to the 610 patent? I think either, Your Honor. If the network itself were something that was identifiable and actually improved in some specific way, I think that could be patentable under the Alice tenet of improve the computer. I think it actually says improve the computer or technology, if I remember the quote correctly. So I think either is the correct answer. But what we know is it shouldn't just use conventional computer technology and apply it to achieve a concept, even if assuming your honors assumption that it's not pre-known. The second thing I think you ought to look at is does the claim specify what that new machine or software is and how it works? Does it, in fact, lay out a specialized piece of hardware, a specialized piece of software, and not just some black box that says, now achieve some aspirational result. Get me to some magical outcome so I can lay ownership or claim ownership to things that semantic engineers have taken millions of people hours to develop. And so if you have an improved thing, now I'm not saying you have to prove novelty, but if the claim on its face is purporting to improve the functionality of the technology and is specific enough that you can identify what that new thing is, then I think you should be in a realm of patentability. So in a hypothetical, it would be your position that if that detecting within the telephone network step talked about some sort of different type of detection, that you would say that that could be eligible because the detection itself is something different or an improvement, a different kind of detecting, whereas what this claim is directed to, I guess generally, is the idea of improving the telephone network by changing the location of where the detection occurs. I wouldn't even go that far. I think when you look at the 610 and you look at all the evidence, it was solving a business problem. The inventors, it was a phone company, the inventors were marketing people and a lawyer. And this is in the record. And what they all said was... We should look at things like that to see what the claim means, right? So forget it. If you don't think that's relevant, let me still get to the point, which is what they were trying to do was solve a business issue for their customers. Instead of sending something that has a virus in it and having to extract it at the sending site or receiving it and having to extract it at the recipient site, they said, well, it's coming through us as a pipeline. Why don't we as a service extract it here? They're not improving the network. They didn't add new hardware or new software they don't claim to have. Added some new piece of programming or some new chip or some new anything. They just say, we're going to do it as a location here because it's good for our customers. That's a benefit. That's a result. But it's not anything new. So going back to your original question, Your Honor, if the 610 had said, here's a way to resolve and better screen viruses in a network than could be done otherwise or has been done before, and we've come up with a new program and here's what it is, or a new machine or apparatus or computer or computing device, and here's what it is. That might be eligible. All this claim says is do conventional virus screening in a conventional telephone network instead of at conventional endpoints, and that should not be eligible. I didn't get to address the 142 or the 050. I don't know if Your Honors have questions about that. I see I'm almost out of my time. I think we don't have any further questions. We'll give you one minute for your server moment. Thank you, Your Honor. I had reserved three. Am I losing two of my three? You are. I am. Thank you. I'll keep that in mind when I take my next one. I think Mr. Lewish has actually very succinctly described why the 610 patent is patent eligible. It does improve. The 610 patent, it is true, is it not, that the only thing that's different about it is the location of the virus screen, which is in the telephone network instead of in the user's computer. Yeah, there's limitations also about that. Identification code, the novelty of it, yes, that's right. What makes it different from the way that folks have been approaching the virus detection problem is that the virus detection will be done entirely within the network and limited to computers connected to the network and not the user's computers, and that solves a big problem, but the problem is a technological problem, not a business problem. But that seems to be a very broad claim, and the patent itself describes it as a, quote, concept, unquote. So they put on a strong case about non-infringing alternatives. The virus screening is the same, isn't it, as it would be at the computer, the virus screening software, the patent that says you can use any conventional virus screening software. That's right. I mean, I think what we're going to end up debating is whether it was obvious to take the idea of limiting it entirely to the network and add it to the way that folks had been approaching the virus screening problem before. I think the question more is whether it's so broad that it's an abstract idea that is just this is the idea, now do it, as opposed to this is the idea, here is some technological development on how you can do it. I mean, it's broad in the sense that we've identified the particular novelty that we all agree is involved in the 610 patent, and then we did claim that novelty. But it's no broader than in the famous English case that's talked about in Morse, the person who designs the thing that warms the air that goes into the blast furnace. It's like he does claim the thing that warms the air that goes into the blast furnace, and it's one very small advancement, but he does get that advancement by explaining that it makes it better. Because in O'Reilly they said the broader claims here about using this for any form of communication is not patentable, and that's been viewed in later cases as a one-on-one decision. So how do we draw the line where you've got a very broad patent and hypothetically you don't have a pre-existing concept, how do we know whether a patent like that is patent eligible or not? Where do we draw the line? I think the best way to do it is to look at the patent in the context of the problem being solved and ask if that problem is technological, and in the solution there's a teaching there sufficient to overcome the problem. We all agree, or at least at trial their experts testified, that the problem that's solved by the 610 patent is technological. But that would be true in O'Reilly. It was a technological issue that was being addressed in the broadest plan. That doesn't seem to me to be that helpful. So there was no teaching in the Claim 8 sufficient to overcome the technological problem. The Claim 8 doesn't even explain, in O'Reilly, didn't explain anything about how you would use the electric or galvanic force to communicate characters at a distance. That's what made that claim problematic. The 610 patent teaches something that no one's disputed, that it's insufficient to tell people how to do it. It teaches you to put it on the network. Well, it just says put it on the network. It doesn't tell you how to do it, right? It tells you to limit it to the network. But it doesn't tell you how to put it on the network. Again, we can have a dispute about whether that's a simple enough... No, no, you've got to answer my question. Does it tell you how to put it on the network? The patent claims and specification do teach you how to put it on the network, yes. I mean, they don't limit it to one particular way of limiting it exclusively to the network, other than it has to be exclusive. And there was a huge dispute at trial, for example, about whether it was include the gateway nodes associated with the two servers, and the claim constructions resolved that dispute in order to show that the claims don't actually reach all ways of doing it involving the network or anything like that. It is limited. You can ask whether I think it's just too simple an innovation to be non-obvious, for example. But it's not abstract just because you've identified a small but important piece of progress over the existing art. And that's true of the 0502. I just want to return to this briefly because Mr. Lumish mentioned it. The problem that is being solved by the 050 patent is clearly a technological problem. They're recited on the face of the patent. I think you're over your time here, so I'm going to call it a day. Mr. Lumish has the last word here. Thank you, Your Honors. Very briefly, going back to some of the questions that were asked before, the BiSafe case says that something can be abstract, a claim can be abstract even if it's groundbreaking. Fluke says a claim can be abstract even if it's novel. So I wanted to just rely on those authorities as well. I wanted to point out in addition that at Column 1, Lines 65 through 67 of the 610 patent, it defines what a virus is, and it is incredibly broad. It is unbounded to cover any, as it says, deleterious data. And so the breadth that is being sought for coverage, the preemption potential for the 610 claim is huge. And then the last thing I wanted to say was we talked about it in light of your question, Your Honor. The assumption that doing virus detection on the telephone network was new and not done before. I wanted to make clear for the record and for the court that at JA 2777, 2777, 2777, intellectual ventures expert Dr. McDaniel conceded, in fact, that a prior art reference called Schnur, quote, did detect for viruses within a telephone network. So the presupposition that this was groundbreaking or revolutionary or even new is just wrong. Okay. Thank you, Mr. O'Malley. Thank you, counsel, the case is submitted.